UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                          :
CHERYL ROSENBLATT,                                        :
                                                          :
                                  Plaintiff,              :
                                                          :          05 Civ. 5521 (GEL)
        -against-                                         :
                                                          :          **OPINION AND ORDER**
THE CITY OF NEW YORK, et al.,                             :
                                                          :
                                  Defendants.             :
                                                          :
-------------------------------------------------------------x

Antonette M. Milcetic, Taubman Kimelman &
Soroka, LLP, New York, New York, for Plaintiff.

Michael A. Cardozo, Corporation Counsel of the City
of New York (Amy Grossberg, Assistant Corporation
Counsel, of counsel), for Defendants.

GERARD E. LYNCH, District Judge:

        Plaintiff, who works for a New York City agency, alleges that she suffered unlawful

workplace retaliation for reporting purported fraud by her supervisors to city investigators and

for filing a complaint of racial discrimination.  She claims unjustly to have endured numerous

adverse actions, including placement on involuntary psychiatric leave, and seeks damages

pursuant to 42 U.S.C. § 1983 for violation of her First Amendment rights and pursuant to the

New York State and City Human Rights Laws, see N.Y. Exec. Law §§ 290 et seq. and N.Y.C.

Admin. Code §§ 8-101 et seq., for infringment of her right to be free from discrimination.

        Defendants move for summary judgment, arguing among other grounds that the events

complained of were either too minor or too attenuated to constitute retaliation for plaintiff's

reporting of problems, and that any adverse action was motivated by legitimate, nonretaliatory

concerns.  For the reasons discussed below, the motion as to plaintiff's First Amendment claim

will be denied as against defendant Rosemary Kennedy, but will be granted as to all other

defendants; and it will be granted as to plaintiff's claims under city and state laws.

## BACKGROUND

Plaintiff Cheryl Rosenblatt was during the relevant time, and still is, employed as a

caseworker by New York City's Administration for Children's Services ("ACS").  Her

responsibility as a caseworker is to determine the eligibility of applicants for publicly funded day

care services based on certain rules and procedures.  Unless otherwise noted, these and the

following factual descriptions are based on uncontroverted evidence.

Although the record is far from clear about every party's role in the alleged events or in

the workplace, it seems that each of the individual defendants held some position of authority

relative to the plaintiff and experienced a history of friction with her.  Doris Bell apparently

supervised plaintiff in some capacity from 1997 through Bell's retirement in approximately

October 2002.  (See D. Rule 56.1. Stmt. ¶¶ 13, 69.)  Defendant Adlyn Greenaway-Morson

became plaintiff's direct supervisor in April 2003.  From 1997 to approximately October 2002,

defendant Kennedy was the director of the ACS center where plaintiff worked.  In about October

2002, defendant Dorothy Vereen took over as director for Kennedy, after Kennedy was

promoted.  Defendant Rosie Henry, who became deputy director apparently of the same ACS

center sometime in 2002, "controlled" the "data entry unit" of plaintiff's workplace and was in

charge of distributing paychecks.  (Rosenblatt Dep. at 185, 188-89.)

Plaintiff began complaining to Kennedy in the summer of 1999 about being pressured by

Bell to approve ineligible day-care applicants.  On August 28, 2001, plaintiff attended a meeting

with Bell and Kennedy, where she accused Bell of improperly approving ineligible cases and

2

said she would report Bell to the Inspector General ("IG") of the city's Public Assistance and Grants Unit.  Kennedy later questioned Bell about the accusations plaintiff had made at the meeting.  Also around that time, plaintiff announced that she would report Kennedy to the IG as well.

By a letter dated September 21, 2001, plaintiff actually reported Bell's and Kennedy's alleged misdeeds to the IG.  She wrote that she had information about Bell's "pressur[ing] caseworkers, including me, to approve eligibility for parents to receive day care service[s] with documents that contradict" official procedures and policies, and that she had "knowledge of fraudulent documents that Doris Bell forced caseworkers to approve."  (D. Ex. I.)  She added that she had notified Kennedy of Bell's alleged misconduct, but that "I do not believe any corrective action was initiated."  (Id.)   She met with IG investigators soon after.

Plaintiff's attorney at the time sent Bell and Kennedy a letter dated September 24, 2001, advising them of plaintiff's report to the IG and expressing her client's "concern[] about any reprisals that may ensue."  (P. Ex. H.)  Near the time of her IG report, plaintiff told Kennedy that Bell was harassing her for speaking up about Bell's alleged misconduct; the only detail alleged is that Bell "falsely accus[ed plaintiff] of hitting [Bell] in the eye with" a document (D. Rule 56.1. Stmt. ¶ 64).  In late September 2001, Kennedy wrote several internal memoranda noting that the plaintiff appeared "more fragile and . . . anxious" following the recent death of her father, "continues to have outburst [sic] and challenges directives," refused to sign a certain form as was required, and "stated that she is willing to lose her inheritance if it ensured her that Doris Bell would lose her job."  (P. Ex. I.)

3

From October 2001 until October 2002, plaintiff has testified, there was no harassment, and "everything was fine." (Rosenblatt Dep. at 184.)  In October 2002, "[t]he atmosphere started to change," plaintiff states.  (Id. at 185.)  Her only detailed allegations from around that time are that: "[c]ases were returned to me [from the data entry unit, which defendant Henry evidently controlled] with error sheets stating that there were errors, but there were no errors" (id. at 185); a broken file cabinet lock she had reported to Vereen, who said she would tell Henry to have it repaired, was never fixed; and "my phone didn't work and . . . . the telephone repairman informed me that somebody put glue in the telephone receiver deliberately" (id. at 192).

On April 10, 2003, plaintiff lodged an in-person complaint with ACS's internal equal employment opportunity ("EEO") office that she was "being harassed on the basis of race."  (D. Ex. K.)  The EEO office's contemporaneous record of that complaint notes that plaintiff mentioned each of the individual defendants.  Plaintiff has testified to having filed the EEO complaint "a day or two" after defendant Greenaway-Morson had become her direct supervisor, "hoping that it would be a deterrent" against this defendant's "harassing me."  (Rosenblatt Dep. at 200.)  The purported harassment plaintiff was hoping to deter consisted, at that point, of Greenaway-Morson's criticism of how plaintiff had adopted to working with a new record-keeping form.  (See id. at 195-96.)

The day she filed her EEO complaint, plaintiff wrote Greenaway-Morson a note informing her that she had done so.   (See P. Ex. M).  Greenaway-Morson thereafter retaliated by doing "many things," plaintiff claims.  (Rosenblatt Dep. at 197.)  The supervisor included critical comments on her May 10, 2004, evaluation of plaintiff's work, while nevertheless giving Rosenblatt an "overall rating" of "good": "Employee interviews are lengthy and employee

4

casework skills . . . need[] to be strengthened.  Employee ha[s] to be flexible and . . . to establish

a rapport with the daycare programs to attain additional data needed . . . and to initiate continued

services where applicable . . . . In addition employee must be focus[ed] throughout the interview

process [on] eligibility issues[,] . . . not [on] other issues that are not part of the interview

process."  (P. Ex. T.)  Greenaway-Morson noted similar comments on an April 28, 2005,

evaluation, which also rated plaintiff as "good."  (P. Ex. T.)  Plaintiff had received better ratings

in at least two prior evaluations.  She submits a 1998 evaluation finding her to conduct applicant

interviews "exceedingly well" and to possess a "keen sense of and excellent knowledge of her

job responsibilities," and rating her overall as "very good."  (P. Ex. R.)  She was similarly

assessed as "very good," and deemed "very efficient" and "very knowledgeable," in a 2003

evaluation presumably completed by someone other than Greenaway-Morson.  (P. Ex. S.)

    The only other retaliatory action plaintiff alleges against Greenaway-Morson is that she

"refused to sign unplanned leave slips or sick leave slips," contrary to past procedure, leaving

plaintiff with "no idea if I was going to be marked AWOL if I called in sick or if I wanted to take

a day off because I didn't have any written proof of it."  (Rosenblatt Dep. at 197.)

    Three weeks after filing her initial complaint, plaintiff called the EEO office again to

report that "she continues being subjected to unfair treatment because of her race and religion."

(P. Ex. L.)  Plaintiff complained only that "her issue had to do with her supervisor refusing to

sign a personnel [leave] form."  (Id.)  In follow-up conversations with plaintiff's supervisors, the

EEO office learned that plaintiff was apparently mistaken about the leave procedure and that

defendant Vereen had told her as much, and it told plaintiff to comply with her supervisor's

directives.  Plaintiff was permitted to leave work and visit the EEO office later that day.  The

EEO investigator's April 30, 2003, report notes that plaintiff said she had been told about the changed leave procedure, that she had been given documentation about the change but had not read it, and that she had not lost any money as a result of her purported leave-slip problems with Greenaway-Morson.  Plaintiff told the EEO office that day that she wished to withdraw her discrimination complaint, although she refused to sign a withdrawal form.

Also at some point soon after she complained to the EEO office, plaintiff claims, defendant Henry began to "[make] it extremely difficult for me to get a paycheck," by "just very, very, very slowly giving me [my] paycheck . . . . Sometimes . . . I would have to make two trips, but the whole process could take an average of four minutes . . . . One of the times . . . it took twenty-five minutes."  (Rosenblatt Dep. at 189-90.)  Plaintiff deduced that she was being treated differently than her coworkers because "I didn't see anyone else upset on pay day[,] and I was always upset on pay day."  (Id. at 190.)

On September 30, 2003, plaintiff was placed on emergency involuntary leave pursuant to Section 72 of the New York Civil Service Law, due, according to a letter to her from the ACS Employment Law Unit, "to the exceptional circumstances of your behavior."  (D. Ex. M.) Plaintiff was ordered not to report to work until further notice and told that a psychiatric examination would be scheduled "to determine your fitness to perform the duties of your position."  (Id.)  She was provided a list of the allegedly "disruptive and threatening" acts, on the basis of which she was being placed on leave.  (D. Ex. N.)  The list includes numerous instances of seeming insubordination and hostile behavior around coworkers and superiors.  It also mentions that plaintiff in 2001 had accused Bell of approving ineligible or fraudulent cases, warned Kennedy that, "[i]f you are in the same boat with Doris Bell, you are also going to sink,"

and announced that she had actually made a report to the IG.  (Id.)  Kennedy has testified that

legal personnel at ACS would decide whether to pursue involuntary leave against an employee

"after reviewing the contents of sombody's file or record o[f] their behavior" and would only

know about an employee's workplace behavior "[i]f somebody was documenting and sending it

to legal." (Kennedy Dep. at 131.)  She stated that she would forward information about an

employee to the ACS legal department "[i]f the information came to me or if I witnessed

something or if the behavior wasn't what we consider the best behavior." (Id. at 132.)  The

notice to plaintiff purporting to justify the need for her psychiatric evaluation contains language

identical to the wording of Kennedy's September 2001 notes of plaintiff's accusatory comments

about Bell.  (Cf. D. Ex. N with P. Ex. I.)  During her involuntary leave, plaintiff was directed to

draw upon her sick leave and other accrued leave time.  Plaintiff ultimately was found fit to

continue in her job and told to return in November 2003, and her leave time eventually was

restored.

        Several months after she was found fit to work, plaintiff was charged with five violations

of the city agency's code of conduct.  (See D. Ex. Q.)  After conducting a hearing on July 12,

2004, Administrative Law Judge Kara L. Miller of the city's Office of Administrative Trials and

Hearings found plaintiff guilty of insubordination, use of inappropriate language toward

coworkers and a supervisor, conduct "prejudicial to good order and discipline," failure to be

courteous to colleagues, and "undermining the effectiveness of the performance of her duties,"

based on evidence presented about four incidents from August through November 2003.  (D. Ex.

R at 1; see also D. Ex. N.)  Judge Miller found defendants Greenaway-Morson, Henry, and

Vereen, among other witnesses, to have credibly and consistently testified that plaintiff had at

7

various moments during these incidents used profanity, walked out of a meeting "ranting," refused an order to leave her office building along with others for security alarm-testing, "yelled" at two supervisors, become "irate," "loudly complained that she was being harassed because she is white and Jewish [and] . . . . attempted to enlist the support of a client . . . to act as a witness on her behalf," among other conduct.  (D. Ex. R. at 2-4, 6.)

The judge found plaintiff, on the other hand, not to be credible, explaining that "[h]er attempt to portray herself as a soft-spoken, well-meaning victim was undermined by her behavior in the courtroom," which was "unfocused[,] . . . . disruptive and loud."  (Id. at 6.) During the hearing, plaintiff repeatedly interrupted other witnesses and her own attorney and refused to obey the directions of the judge, Judge Miller noted, "demonstrat[ing] that she has little regard for authority."  (Id. at 6-7, 10.)  The judge found that none of plaintiff's contentions of feeling discriminated or retaliated against "excuse her disruptive, discourteous and unprofessional behavior."  (Id. at 8.)  Although only a 10-day suspension without pay was being sought, Judge Miller recommended 15 days, as 10 would be "inadequate" under circumstances where "[r]espondent has demonstrated no remorse [and] . . . . has justified and rationalized her outrageous behavior."  (Id at 10.)   The ACS commissioner accepted Judge Miller's recommendation.

In September 2004, plaintiff was charged with another set of disciplinary violations, some charges resembling the disruption-type allegations of the first set, but others alleging substantive work deficiencies.  (See D. Ex. V.)  A different administrative law judge conducted a hearing, where defendants Henry and Vereen, among others, testified.  She sustained nearly all of the allegations and recommended 45 days' suspension without pay, which suspension plaintiff

ultimately received.  The findings of the two administrative law judges were recently upheld by

the New York Appellate Division as supported by substantial evidence.  See Rosenblatt v. New

York City Admin. for Children's Servs., 828 N.Y.S.2d 28 (1st Dep't 2007); see also Rosenblatt

v. New York City Admin. for Children's Servs., 833 N.Y.S.2d 895 (1st Dep't 2007).

　　　　Plaintiff filed this action on April 13, 2005, in state court, and two months later

defendants removed it to this Court.

## DISCUSSION

I.　　　Summary Judgment Standard

　　　　Summary judgment shall be granted "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits . . . show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law."  Fed. R. Civ. P. 56(c).  A "genuine issue of material fact" exists if the evidence is such

that a reasonable jury could find in favor of the non-moving party.  Holtz v. Rockefeller & Co.,

258 F.3d 62, 69 (2d Cir. 2001).  The moving party bears the burden of establishing the absence

of any genuine issue of material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256

(1986).

　　　　In deciding a summary judgment motion, the court must "resolve all ambiguities and

draw all reasonable references in the light most favorable to the party opposing the motion."

Cifarelli v. Vill. Of Babylon, 93 F.3d 47, 51 (2d Cir. 1996).  The nonmoving party, however,

may not rely on "conclusory allegations or unsubstantiated speculation," Scotto v. Almenas, 143

F.3d 105, 114 (2d Cir. 1998), and "must do more than simply show that there is some

metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

II.      First Amendment Retaliation

     A.      Prima Facie Showing

To establish a prima facie First Amendment retaliation claim, a plaintiff must prove that: (1) her speech was constitutionally protected, (2) she suffered an "adverse action" constituting "conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights," and (3) a causal connection existed between the speech and adverse action, such that her speech could be said to have been a motivating factor in defendants' adverse action.  Zelnik v. Fashion Institute of Technology, 464 F.3d 217, 225 (2d Cir. 2006) (citations omitted); see also Gronowksi v. Spencer, 424 F.3d 285, 292 (2d Cir. 2005).

     1.      Protected Speech

Defendants argue that plaintiff's report to the IG, the only speech plaintiff claims is protected, does not constitute constitutionally protected speech.  They do not dispute that her reporting on supervisors who allegedly had "forced caseworkers to approve fraudulent documents" seeking publicly subsidized child care (D. Mem. at 5), "addressed a matter of public concern" as required to qualify for First Amendment protection, Gronowski, 424 F.3d at 292. See also Connick v. Myers, 461 U.S. 138, 147 (1983); Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999).  Rather, they contend that the speech does not warrant protection, because "plaintiff was acting pursuant to her official duties when she . . . purport[ed] to report fraud and corruption in the ways she was allegedly told to perform her job."  (D. Mem. at 6-7.)

The Supreme Court has held that, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Garcetti v. Celballos, 126 S. Ct. 1951, 1960 (2006). Defendants describe plaintiff's official duties only as having "to make determinations of eligibility for day care services that met standards set forth in [written guidelines and] in trainings." (D. Mem. at 6.) "Thus," defendants argue, "plaintiff was acting pursuant to her official duties when she" uttered the subject speech. (Id.) By defendants' own description of her job, however, plaintiff's reporting of fraud and corruption allegedly committed by her supervisors plainly was not encompassed within her official duties. Her responsibility was to assess day care *applicants* for eligibility by certain standards. Nothing in defendants' proferred description of her job or in the record suggests that plaintiff was also expected to scrutinize her *supervisors* for fraud – essentially acting as a supervisor of her supervisors – let alone report them to external investigators.[1] Thus, the "official duties" exception does not apply in this case; and defendants provide no other reason to exclude plaintiff's 2001 complaint to the IG about Bell and Kennedy from the realm of First Amendment protection. See Morris, 196 F.3d at 110 (2d Cir. 1999) ("The question whether certain speech enjoys a protected status . . . is one of law, not fact . . . . As a general rule, speech on any matter

---

[1] By contrast, the plaintiff in Garcetti was a deputy district attorney whose disputed speech consisted of reporting to superiors during an ongoing criminal prosecution that police had used a defective search warrant and recommending dismissal of the case. Garcetti, 126 S. Ct. at 1955-56. There was no dispute that "advis[ing] his supervisor about how best to proceed with a pending case" fell squarely within the scope of the deputy prosecutor's official duties, unlike the reporting of supervisory misconduct by a day care-services administrator in this case.

of political, social, or other concern to the community is protected by the First Amendment.") (internal quotation marks and citation omitted).

           2.     <u>Adverse Action</u>

The determination of what conduct constitutes an "adverse action," because it "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights," is "heavily fact-specific [and] contextual." <u>Zelnik</u>, 464 F.3d at 225-26, 228.  A public employee-plaintiff need not demonstrate that the alleged conduct had an "actual chilling effect" on her ability to engage in protected speech, <u>Morrison v. Johnson</u>, 429 F.3d 48, 51-52 (2d Cir. 2005), or that the conduct resulted in "a material change in employment terms or conditions," <u>Zelnik</u>, 464 F.3d at 227, in order to prove First Amendment retaliation.  However, she must show that the purported retaliation was "more than de minimis," in that it "well might have dissuaded a reasonable worker from [speaking]."  <u>Id.</u>; <u>see also</u> <u>Gill v. Pidlypchak</u>, 389 F.3d 379, 382 (2d Cir. 2004) ("[T]he employee's essential burden is to show that he or she was punished, not that his or her speech was 'effectively chilled' from that point forward.")

Here, defendants argue that, besides the two 2004 disciplinary proceedings, none of the unfavorable consequences plaintiff claims to have experienced rises to the level of an adverse action.  Plaintiff opposes only as to her 2003 placement on involuntary leave and as to the purportedly "[n]egative performance evaluations" she received from defendant Greenaway-Morson.[2]  (P. Opp. at 18-19.)  Defendants unconvincingly contend that the involuntary leave –

---

[2] Plaintiff appears to misplace her adverse-action argument as to the evaluations from Greenaway-Morson by raising it in opposition to defendants' arguments on the First Amendment retaliation claim.  Plaintiff's submissions and brief indicate that she asserts these 2004 evaluations to be retaliation *not* for her 2001 report to the IG – two years before Greenaway-Morson became her supervisor – but for her EEO complaints, mentioning Greenaway-Morson,

which included a requirement to undergo psychiatric examination, if plaintiff hoped to retain her job – cannot be deemed actionably adverse, because the leave time plaintiff was compelled to take during that period has "been properly restored, so [any] claim regarding [lost] leave balances is moot." (D. Mem. at 10.)  While this argument may apply to the proper calculation of any ultimate damages,[3] it does not suffice to negate as a matter of law the plain adverseness of placing an employee on involuntary psychiatric leave.  Any employee of ordinary firmness would likely view such an act as bluntly and harshly as plaintiff puts it – "being suspended and labeled crazy" (P. Opp. at 19) – and, if facing such a consequence, think twice about engaging in protected speech.

Plaintiff effectively concedes defendants' other arguments of non-adverse action by her failure to respond to them; and the Court independently deems plaintiff's other grievances, extensively described above, to be individually de minimis and, even together, insufficiently serious to be considered an actionably "critical mass."  Phillips v. Bowen, 278 F.3d 103, 108-09 (2d Cir. 2002) (where plaintiff proved "a pattern of nearly constant harassment . . . that took place over a period of several years," the "combination of seemingly minor incidents . . . reach[ed] a critical mass" of "unreasonable inferiority" sufficient "to form the basis of a

_____

in 2003.  (See Rosenblatt Dep. at 196, 256; see also P Opp. at 2, 25.)  The adverse nature of the evaluations will therefore be considered during discussion of plaintiff's state and city retaliation claims.

[3] Plaintiff has rather vaguely testified to certain, seemingly quite modest, losses that may not have been fully accounted for when her leave balances were, undisputedly, restored.  While it is difficult to discern the precise nature of these alleged losses, they appear to consist of: pay unfairly withheld presumably for absences taken before her leave was restored, and/or days of additional leave she would have accrued had she been working with her full balance of leave all along.  (Rosenblatt Dep. at 342-43.)

constitutional retaliation claim."); see also Deters v. Lafuente, 368 F.3d 185, 189 (2d Cir. 2004)

("Incidents that are relatively minor and infrequent will not meet the standard.") (quoting

Phillips); cf. Bernheim v. Litt, 79 F.3d 318, 324-36 (2d Cir. 1996) (deeming public school

teacher's First Amendment retaliation claim to survive 12(b)(6) motion, because allegations of

demotion, of reduced preparation time, of assignment to remote classroom despite plaintiff's

known disabilities, and of negative evaluations, together sufficed to state a claim of actionably

adverse action, even though if "treated separately" many would be "trivial," and even though

they would be subject to "prun[ing]" at a later stage).  No reasonable factfinder could find

Rosenblatt's remaining allegations of defendants' acts to describe conduct likely to dissuade a

similarly situated, ordinary worker from engaging in protected speech.[4]

### 3.    Causal Connection

Defendants next insist that the existing record cannot support an inference that the

plaintiff's protected report to the IG was a motivating factor in defendants' taking any of the

adverse actions alleged.  They contend that "temporal proximity is the only purported evidence

of causation[,] . . . other than [plaintiff's] unsupported conclusory allegations," and that the span

of at least two years between the protected speech and the adverse actions is too great to suggest

a causal nexus.  (D. Mem. at 12.)

To the contrary, however, there is undisputed documentary evidence upon which a

reasonable factfinder could conclude, despite the lag of some two years, that defendants placed

plaintiff on involuntary leave in 2003 at least in part due to her report to the IG in 2001.  The

---

[4] Defendants' argument that claims accrued prior to April 13, 2002, are barred by the statute of limitations is therefore rejected as moot.

very reasons that were supplied to plaintiff in writing at the time to explain her placement on involuntary leave refer explicitly to the plaintiff's 2001 report to the IG, to knowledge within the workplace of plaintiff's accusations, and to observations of her seeming distress in connection with that report and specifically with worries about reprisal.  (See D. Ex. N.)  It cannot be said on this record that no causal connection could be found to exist between plaintiff's protected speech and her placement on involuntary leave.

Nor have defendants managed to negate any issue as to the possible connection between that speech and the two disciplinary proceedings instituted against plaintiff in 2004.  While the written charges in those cases do not explicitly mention plaintiff's actions in 2001, their initiation followed by only several months the finding of plaintiff's psychiatric fitness to work, which ended her involuntary leave.  A reasonable factfinder could, if it discerned a causal connection between the speech and the involuntary leave, infer from the proximity between the leave proceedings and the disciplinary actions that the latter were at least to some degree a part of defendants' continuing reaction to plaintiff's IG report.  Indeed, defendants implicitly concede that the lack of a causal nexus should not be inferred merely from the absence of explicit reference to plaintiff's 2001 conduct in the 2004 disciplinary charges.  They state that the Civil Service Law prohibits commencement of a disciplinary proceeding more than 18 months after the occurrence of any misconduct alleged, explaining that it was therefore "too late for ACS to bring disciplinary charges in 2004 concerning the threats and other misconduct that plaintiff committed in 2001."  (D. Rep. at 5, n.3.)  That defendants legally could not have disciplined plaintiff in 2004 for her actions in 2001, even if they had wanted to, does not negate the possibility that her speech at least in part motivated them to press what disciplinary charges they

could.  They could be taken as arguing that, given the disciplinary time-bar, any employer actually plotting to punish plaintiff's 2001 speech in this way surely would have pressed misconduct charges years sooner, and that therefore their delay clearly sanitizes the disciplinary proceedings in this case of suspect motive.  However, the First Amendment does not protect employees only from sensible or efficient employers.

      B.    <u>Defendants' Rebuttal</u>

A defendant may defeat a prima facie case of First Amendment retaliation at the summary judgment stage, if it can show that no genuine issue of material fact exists to preclude the conclusion, based on a preponderance of the evidence, that defendant "would have taken the same adverse employment action even in the absence of the protected conduct."  <u>Morris</u>, 196 F.3d at 110 (internal quotation marks and citation omitted); <u>see also</u> <u>Heil v. Santoro</u>, 147 F.3d 103, 110 (2d Cir. 1998).  The defendant need not show that the protected activity had no bearing at all on the adverse decision, but only that the decision would have been made regardless of plaintiff's protected speech, for legitimate reasons.  <u>See</u> <u>White Plains Towing Corp. v. Patterson</u>, 991 F.2d 1049, 1060-61 (2d Cir. 1993).

Defendants contend that "[p]laintiff's . . . complaint to the IG's office . . . had nothing to do with defendants' efforts to address plaintiff's inappropriate, disruptive conduct in the office, first by having her assessed for fitness [and] then by having her disciplined."  (D. Mem. at 15.)  Even assuming that the IG complaint did have at least *something* to do with all of the alleged adverse actions, however, the existing record clearly demonstrates that defendants' initiation of the 2004 disciplinary proceedings was justified by a panoply of legitimate, nonretaliatory reasons, and would have occurred regardless of plaintiff's protected speech.  Two administrative

law judges – after conducting evidentiary hearings where plaintiff had and exercised an opportunity to be heard – found plaintiff to be guilty of numerous acts of insubordination, disruption, discourtesy, and other code-of-conduct violations that did not include any act relating to her IG report.  (See D. Exs. R, W.)  These findings were recently upheld by the New York Appellate Division as supported by substantial evidence.  See Rosenblatt v. New York City Admin. for Children's Servs., 828 N.Y.S.2d 28 (1st Dep't 2007); see also Rosenblatt v. New York City Admin. for Children's Servs., 833 N.Y.S.2d 895 (1st Dep't 2007).

Plaintiff does not, as she could not, attempt to relitigate whether she actually committed the disciplinary violations alleged in those actions.  See University of Tennessee v. Elliott, 478 U.S. 788, 798 (1986) ("[W]hen a state agency acting in a judicial capacity . . . resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts.") (internal quotation marks and citation omitted); see also Davis v. Halpern, 813 F.2d 37, 39 (2d Cir. 1987) (enumerating New York standard for issue preclusion); see also Doe v. Pfrommer, 148 F.3d 73, 79 (2d Cir. 1998) (district court may give administrative law judge's findings preclusive effect to bar Section 1983 claim).  Given the proven facts of plaintiff's repeated misconduct – unrelated to her report to the IG – and also the apparent insufficiency of just one disciplinary proceeding to halt her misconduct, no reasonable factfinder could conclude on the existing record that defendants would not have pressed disciplinary

charges against plaintiff in 2004, if she had not reported her former supervisors to the IG in 2001.[5]

Whether plaintiff would have been subjected to involuntary psychiatric leave had she never reported Bell and Kennedy for alleged fraud presents a closer question that must survive summary judgment.  As discussed, the decision to pursue this adverse action was explicitly justified partly by reference to plaintiff's IG report and related conduct.  (See P. Ex. O.)  Indeed, the October 2003 notice to plaintiff explaining why she was being instructed to undergo a psychiatric evaluation contains language identical to the wording of Kennedy's September 2001 notes of plaintiff's accusatory comments about Bell.  (Cf. id. and P. Ex. I.)  Moreover, one of the 20 "examples" of plaintiff's "disruptive and threatening" behavior listed reads: "On or about September 26, 2001, [an agency staffer] received a letter from [plaintiff's] attorney, advising her of [plaintiff's] complaint to the Inspector General's office of Doris Bell's malfeasance and of [plaintiff's] fear of reprisals."  (P. Ex. O.)  Kennedy has testified that the agency legal department could not have known to initiate involuntary leave proceedings against plaintiff without documentation of plaintiff's behavior from those who worked with her; Kennedy herself created and apparently supplied such documentation.  While the written reasons for placing plaintiff on involuntary leave include numerous allegations unconnected to her IG report, the explicit allusions to plaintiff's protected speech as a basis for taking action against her suffice to

---

[5] This Court independently deems the undisputed record in this case – which includes the administrative law judges' findings of plaintiff's misconduct – sufficient to prevent any reasonable factfinder from concluding that disciplinary charges would not have been pressed but for plaintiff's protected speech.  It is therefore unnecessary to address defendants' argument that Judge Miller's rejection of plaintiff's retaliation argument in a disciplinary proceeding – where the issue may not have been identically or as extensively litigated as a legal question – should be given preclusive effect here.

prevent the Court from concluding that no reasonable factfinder could find this adverse action to have been motivated in significant part by the speech.

### C.  Insufficiency of Proof Against Particular Defendants

Defendants Greenaway-Morson and Vereen seek summary judgment of nonliability on plaintiff's First Amendment retaliation claim, arguing that there is insufficient evidence of their personal involvement in any such retaliation.  See Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (proof of personal involvement of defendant is a prerequisite to an award of damages under Section 1983); see also Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996) ("a defendant in a § 1983 action may not be held liable for damages . . . merely because he held a . . . position of authority") (citation omitted).  As plaintiff herself has testified that she is not alleging that these defendants retaliated against her for complaining to the IG's office, (Rosenblatt Dep. at 196, 256; see also P Opp. at 2,) this claim must be dismissed as against them.[6]

Bell cannot have retaliated against plaintiff for the IG report by participating in placing her on involuntary leave in 2003, as she evidently retired in approximately October 2002. Morever, nothing in the record, extensively described above, indicates any involvement of defendants Bell, Henry, Greenaway-Morson, or Vereen in the decision to place plaintiff on involuntary leave.  Any other actions that could be attributed to these individuals on the existing evidence do not, as discussed, rise to the level of an adverse action within the meaning of First

---

[6] In her opposition brief, plaintiff writes that "the record raises triable issues of fact as to her claims against individual defendants Kennedy and Greenaway-Morson" (P. Opp. at 2), apparently conceding that nothing remains to be tried as against the other defendants.  Moreover, the reference to Greenaway-Morson appears to relate not to the involuntary leave claim, but to other issues discussed below.  These concessions alone suffice to urge dismissal of the other defendants from the case.  The Court has, however, independently reviewed the record, and for the reasons below concludes that summary judgment in their favor is warranted in any event.

Amendment retaliation.  Because no reasonable factfinder could conclude on this record that these defendants retaliated against plaintiff for exercising her First Amendment rights, they are entitled to summary judgment on this claim.[7]  Thus, plaintiff's First Amendment retaliation claim survives only as against defendant Kennedy.

       D.     Qualified Immunity

Kennedy argues that she is entitled to qualified immunity, because her conduct as a government official performing discretionary functions "[did] not violate clearly established statutory or constitutional rights of which a reasonable person would have known" and was objectively reasonable in light of the information she possessed at the time.  Washington Square Post No. 1212 American Legion v. Maduro, 907 F.2d 1288, 1290-91 (2d Cir. 1990) (citations omitted).  There is no question, however, that plaintiff's right not to be retaliated against by her employer for uttering protected speech was clearly established, as for decades the courts have "consistently held that while the government enjoys significantly greater latitude when it acts in its capacity as employer than when it acts as a sovereign, the First Amendment nonetheless prohibits it from punishing its employees in retaliation for the content of their protected speech." Locurto v. Safir, 264 F.3d 154, 166 (2d Cir. 2001).

Nor can Kennedy's conduct be deemed to have been indisputably and objectively reasonable on the existing record.  Kennedy knew that plaintiff had accused her of facilitating

---

[7] The City of New York seeks summary judgment as to all of plaintiff's claims on the ground that plaintiff has failed to present any evidence tending to establish municipal liability under Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658 (1978).  Plaintiff having failed to respond in any way to this contention, and the Court having independently discovered no reason to decide otherwise, plaintiff is deemed to have abandoned any opposition to this, in any event meritorious, argument.  Accordingly, summary judgment is granted to the City of New York on all claims.

fraud in a complaint to the IG.  She knew that documentation of an employee's workplace

behavior was necessary for the agency legal department to initiate involuntary leave proceedings

against an employee.  She created documentation of plaintiff's workplace behavior, including of

plaintiff's actions relating to the protected IG report, that appears to have been used to build the

case for subjecting plaintiff to involuntary leave and to a possible finding of unfitness to return to

work.  These facts could sustain an inference that Kennedy's conduct was motivated by her

desire to retaliate against plaintiff for exercising her First Amendment rights.  Even though the

record contains a wealth of evidence upon which a factfinder ultimately could conclude that

Kennedy acted reasonably and for legitimate reasons, because there is nevertheless sufficient

evidence of retaliatory motive to create a genuine issue of fact, the question of defendant's

liability must be left for a jury to resolve.  See Mandell v. County of Suffolk, 316 F.3d 368, 385

(2d Cir. 2003).

III.    Retaliation Under City and State Laws

       In addition to claiming under Section 1983 that she was unlawfully retaliated against for

her report to the IG, plaintiff alleges pursuant to the New York State and City Human Rights

Laws that she suffered illegal retaliation for filing a race discrimination complaint with the EEO

office of ACS.  A prima facie case of retaliation under these laws requires proof that (1) plaintiff

engaged in protected activity, (2) the employer was aware of the activity, (3) plaintiff was

subjected to a sufficiently adverse action, and (4) a causal connection existed between the

protected activity and adverse action.  See Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183

F.3d 155, 159 (2d Cir. 1999) (describing prima facie retaliation standard for ADA claims as

identical to Title VII standard); see also Farias v. Instructional Systems, Inc., 259 F.3d 91, 98 (2d

Cir. 2001) ("Claims of discrimination under the Human Rights Laws of New York City and New York State are evaluated using the same analytic framework used in Title VII actions.").  In this case, summary judgment must be granted to all defendants on the state and city law claims for at least the reason that plaintiff has failed to indicate evidence that she was subjected to a sufficiently adverse action.

The standard for measuring adverseness in this context resembles the standard in the First Amendment retaliation context: Plaintiff need not prove that an alleged adverse action actually affected the terms and conditions of her employment, but she must show that "a reasonable employee would have found the challenged action materially adverse, which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Burlington Northern and Sante Fe Ry. Co. v. White, 126 S. Ct. 2405, 2415 (2006) (redefining the adverse-action standard for Title VII retaliation claims) (citation omitted). The only retaliatory consequences plaintiff claims she experienced as a result of her EEO complaints are Greenaway-Morson's critical evaluations of her work – which included a decision to restrict plaintiff from processing certain types of cases – and Greenaway-Morson's repeated failure to sign slips acknowledging plaintiff's requests for unplanned and holiday leave. (See P. Opp. at 25.)

No reasonable factfinder could conclude that Greenaway-Morson's evaluations constituted sufficiently adverse action.  The evaluations actually rate plaintiff as "good" overall, where lesser options included "conditional," "unsatisfactory," and the rather ominously ambiguous "unratable."  (P. Ex. T.)  Indeed, on certain tasks, Greenaway-Morson rated plaintiff to be "very good."  (Id.)  Plaintiff received a less than "good" rating on only one task, on one

22

evaluation.  (Id.)  The explanation for that task-rating of "conditional" reads: "On 10/5/04 Ms. Rosenblatt was assigned field cases as part of the regular duties at the resource area.  Employee demonstrated difficulties processing the cases.  The duties of processing field cases at the resource area were removed from her on 11/5/04."  (Id.)  Plaintiff was assigned the relevant task over a year *after* she had complained to the EEO office in April 2003; it therefore would be illogical to infer that her removal from performing that task was to punish her for the EEO complaint.  While plaintiff submits evidence that at times in the past she had received higher ratings from other supervisors, she offers nothing – not even her own testimony – to show that the shift from one positive rating to a lower but still positive rating portended any actually negative consequence for someone in her circumstances.

Nor could any reasonable factfinder decide that Greenaway-Morson's failure to sign plaintiff's leave slips constitutes a sufficiently adverse action.  In the first place, there is contemporaneous evidence that the office leave policy had changed to obviate the need for plaintiff to obtain her supervisor's signature on these slips.  (See P. Ex. L.)  Moreover, the same evidence documents plaintiff as admitting she had "not lost any money" – presumably meaning she had not been forced to take any absence unpaid – as a result of Greenaway-Morson's refusal to sign the slips.  (Id.)  Plaintiff does not otherwise indicate any evidence that her problems with the leave slips resulted in any actual, negative consequence.  An action devoid of practical adverse consequence could not deter a reasonable employee from protesting illegal discrimination.

## CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is granted except as to defendant Kennedy's liability on the claim of First Amendment retaliation.


SO ORDERED.

Dated: New York, New York
      July 30, 2007

_____

GERARD E. LYNCH
United States District Judge
